IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RONALD HENEGHAN, | : | CIVIL ACTION |
| Plaintiff | : | |
| v. | : | |
| | : | NO. 09-04979 |
| | : | |
| NORTHAMPTON COMMUNITY | : | |
| COLLEGE, et al, | : | |
| Defendants | : | |

Stengel, J.                                                                 July 11, 2011

The plaintiff in this matter, Ronald Heneghan, claims that Northampton Community College violated his right to procedural due process when it rescinded its decision to offer him a tenured employment position in the College's Theatre Department.  He also claims that the College and its Dean of Humanities and Social Sciences, Elizabeth Bugaighis, are liable for violating Title VII and the PHRA because they discriminated against him on the basis of his gender.  The defendants filed a motion to dismiss his amended complaint and this Court granted the motion in part and denied it in part.  Heneghan then filed a second amended complaint. Discovery has been completed, and the defendants have filed a motion for summary judgment in their favor on Heneghan's remaining claims.  I will grant the motion.

I.      FACTS

        A.      Facts Relevant to Procedural Due Process Claim

        Ronald Heneghan began employment at Northampton Community College ("NCC" or "the College") in the fall of 2003 in a tenure-track, initial appointment position as Associate Professor of Communications and Theatre.  Def. Concise Statement of Material Facts ("Def.

SMF") ¶ 1.[1]  Mr. Heneghan was a member of a union, the American Federation of Teachers

("the Federation"), which had a Collective Bargaining Agreement with NCC.  Id. at ¶ 2; Def. Ex.

11, Collective Bargaining Agreement ("CBA").  That agreement provides, among other things,

that faculty appointments may be either "temporary, initial, or standard."  CBA Article VI, ¶ A.

"Faculty on initial contracts are typically offered six (6) one (1) year contracts."  Id. at ¶ C.  The

CBA further provides that,

> Initial appointments may be renewed, or not renewed at the option of the
> College and for any reason, but the Faculty Member shall be given a
> statement of reason upon request.  Non-renewals during the first five (5)
> years may not be appealed, but a Faculty Member may appeal a non-
> renewal occurring during the sixth year of employment to the Board within
> one (1) month of notification.  The Board's decision in the appeal shall be
> final.  The Faculty Member may be represented by the Federation.
> . . .
> Faculty with these appointments shall not be given the rights in Article XII,
> paragraph E, but shall retain all other rights accorded to all other faculty
> with standard appointments.

Id. at Art. VI, ¶ C.  Article XII pertains to retrenchment of faculty members, and paragraph E

explains in detailed terms the rights of faculty with standard appointments, i.e. tenured faculty:

"retrenchment of an Employee shall not occur if a position can be made available by the

elimination of part-time and overload assignments and temporary and initial appointments for

which the Employee is qualified[.]"  Id. at Art. XII, ¶ E.  Article X of the CBA provides, except

with respect to the provisions for termination under Section VI, that a faculty member may be

discharged "only for just cause."  Id. at Art. X, ¶ A.  In other words, a faculty member under an

initial appointment during the first five years has the right to a statement of reasons for non-

renewal, but has no appeal process.  A faculty member who is denied another year of

---

[1] Statements of fact by the defendant admitted by the plaintiff are cited herein.  Statements of fact not
admitted by the plaintiff are not cited, and the Court instead refers to evidence in the record, viewing that
evidence in the light most favorable to the plaintiff.

employment during the sixth year has the right to both a statement of reasons and an appeal to

the Board.  Standard appointment, or tenured, faculty members, are guaranteed employment

absent "just cause" for dismissal.

During his sixth year at NCC, in February of 2009, Mr. Heneghan was notified that he

was recommended for standard appointment to NCC's Board of Trustees ("the Board").  Def.

SMF ¶ 14.  On March 5, 2009, the Board voted to approve his standard appointment.  Id. at ¶ 15.

In a memorandum to Mr. Heneghan, Kathy Siegfried, Director of Human Resources at the

College, notified him of the Board's vote, stating that his appointment was "effective with the

2009/10 academic year."  Def. Ex. 3.  However, on March 13, 2009, Heneghan received a letter,

written by College President Arthur Scott and delivered by Vice-President of Administrative

Affairs Mike McGovern, reversing this decision.  See Def. Ex. 1, Heneghan Dep. Session 1, July

19, 2010 ("Heneghan Dep. 1"), at 73-75.  It stated, "This is to officially notify you that we are

rescinding the March 6, 2009 memorandum notifying you of the College's decision to grant you

a standard appointment.  This decision has been delayed until further notice."  Def. Ex. 4.

At some point in late March, 2009, Mr. Heneghan attended a meeting with Helene

Whitaker, Vice-President of Administrative Affairs, Dr. Bughaghis, Dr. McGovern, and

Margaret Closson, Vice-President of Student Affairs.  Heneghan Dep. 1, 82:19 - 83:24.  He was

informed by these administrators that his tenure had been rescinded due to non-collegial conduct

with his colleagues and because "the college had discovered several things about [his] work that

were cause for concern."  Heneghan Dep. 1, 84:6-13; Def. Ex. 2, Heneghan Dep. Session 2, Jan.

31, 2011 ("Heneghan Dep. 2"), at 27:1-17.  Specifically, Ms. Whitaker accused Mr. Heneghan of

sexually harassing a student, kissing a student, and providing beer to underage students.  See

Heneghan Dep. 2, 27:1-17; Heneghan Dep. 1, 85-88.  Mr. Heneghan answered questions about

these allegations, explaining with respect to the beer that he had attended a student cast party and

brought beer, but that the beer was for his personal consumption.  Heneghan Dep. 1, 86:12-17.

He admitted during his deposition that he didn't actually drink any of the beer, and left it all in

the refrigerator at the party.  See id. at 87.  The administrators also asked him about an

interaction with a student in which he had "humiliated" that student.  Heneghan Dep. 2, 43:4-19.

 Following the meeting and on April 2, 2009, Mr. Heneghan sent a three-page letter to

Ms. Whitaker, Ms. Closson, Dr. McGovern and Dr. Bugaighis responding to some of the issues

raised during the meeting.  Def. Ex. 15.  In the letter, Mr. Heneghan admitted that he had both

commented on a student's "look and physical presence" in front of a class, and kissed a student

during a rehearsal but apologized to her.  See id.  His letter was in large part directed at the

collegiality issue addressed at the meeting.  He explained that "inconsistencies with my

colleagues have been a challenge," and detailed many conflicts that had arisen between him and

Jaye Beetem, another faculty member in the Theatre Department.  See id.  He asked that the

recipients of the letter communicate his thoughts with the Board of Trustees "as this process

continues."  Id.  On April 2, 2009, the Board of Trustees ratified the rescission of Mr.

Heneghan's standard tenure appointment.  See Def. SMF ¶ 24; Def.'s Ex. 10.

 On April 9, 2009, Mr. Heneghan officially appealed the decision rescinding his tenure by

sending a letter to Ms. Whitaker, citing his appeal rights under Article VI, ¶ C of the CBA

pertaining to sixth year initial appointment faculty members.  See Def. Ex. 5.  He notified Ms.

Whitaker that he would be represented by Shelly Snyder, of the American Federation of

Teachers, in his appeal.  See id.; Def. SMF ¶ 31.  On April 15, 2009, Mr. Heneghan received a

letter from Ms. Whitaker confirming the reasons for the rescission.  She cited his non-collegial

behavior with his colleagues and troubling interactions with students, including bringing beer to

cast parties, kissing a student, humiliating numerous students, and using inappropriate language. See Def. Ex. 6.  On April 20, 2009, Mr. Heneghan was informed by letter that the Board of Trustees would hear his appeal on May 7, 2009.  See Def. Ex. 7.  He had requested a closed hearing before the board, but Ms. Whitaker, Dr. Bugaighis, and Dr. McGovern were present. Heneghan Dep. 1, 146:8-21.  Mr. Heneghan gave an opening statement asking the Board to remember his work as a teacher in considering whether to grant him tenure.  Id. at 147:16-148:17.  Ms. Snyder also made opening comments to the Board.  Id. at 150:17-151:4.  Mr. Heneghan gave the Board materials in support of his arguments, including letters on his behalf. Id. at 144-145.  He was asked questions about the same allegations addressed in his earlier correspondence with Ms. Whitaker, including bringing beer to a student event, his collegiality with other department members, his use of language, and other incidents Ms. Whitaker had identified in her April 15, 2009, letter.  See id. at 151-152.  Mr. Heneghan responded to all questions asked of him.  Id. at 152:10-153:5.  He learned the next day that the Board had voted unanimously not to grant him tenure.  Id. at 156:15-24.  He received official notice that his appeal had been denied on May 11, 2009.  Def. SMF ¶ 34.

On May 13, 2009, Mr. Heneghan filed a union grievance regarding NCC's decision denying him tenure.  Def. SMF, ¶ 35; Def. Ex. 8.  Article XIV of the CBA sets forth the rules for the filing of grievances.  Under these rules, a grievant shall "present a grievance at the lowest administrative level having authority to dispose of the grievance within fifteen (15) College days after the occurrence or condition giving rise to the grievance[.]"  CBA Art. XIV, ¶ D.  The College's administrative representative has fifteen days to submit a written response to the grievant, and if the employee's grievance is not resolved by the response, the grievant may appeal to the President of the College.  Id.  Following appeal to the President, the grievant, may,

through the Federation, submit the matter to the American Arbitration Association for arbitration.  Id.  Mr. Heneghan's grievance was denied.  The Federation decided not to proceed with the second step of the grievance process by appealing to the President.  Def. SMF ¶ 36.

### B.    Facts Relevant to Gender Discrimination Claim

Julie ("Jaye") Beetem was hired as a faculty member in the Theatre Department at NCC in January of 2006.  Second Am. Compl. ¶ 14.  She was not Heneghan's supervisor.  Def. SMF ¶ 4.  In his Second Amended Complaint, Mr. Heneghan alleges that after Ms. Beetem was hired, "[i]t quickly became obvious [] that [she] was hostile to males in Theatre."  Second Am. Compl. ¶ 15.  Mr. Heneghan alleges that evidence of this consisted of (1) her hostile response to a male guest play director in the Spring 2006 semester; (2) the fact that she was "directly responsible for at least two male students withdrawing from the Theatre program at NCC"; (3) her spreading "false rumors" about another male guest director in the Spring 2008 semester; (4) her opposition to a male candidate for a position in the Theatre department; and (5) the fact that, beginning in 2007, she "began a course of conduct aimed at having Heneghan removed from his position" at NCC.  Id. at ¶¶ 15, 19, 20, 25-26, 28.  With respect to her alleged attempts to have Mr. Heneghan fired, he claims Ms. Beetem "attempted to blackmail him," made statements indicating that "she was going to destroy Heneghan's employment at NCC and [] compromise his ability to obtain work elsewhere in educational theatre," failed to perform her duties in connection with a play he directed, blamed him for an injury to a student that was actually her fault, excluded him from department decisions, and finally, "began a campaign against him designed to have his tenure revoked" after she learned of the decision granting him tenure.  See id. at ¶¶ 22, 23, 29, 32-35, 38, 39.

Mr. Heneghan alleges he "made complaints to Dr. [] Bugaighis about the sexually discriminatory actions by Beetem, but no action was taken to stop her," that he "made NCC administration aware of these threats by Beetem, specifically to [sic] Dr. Bugaighis," and that he "made a complaint to Bugaighis by letter of March 5, 2008 that Beetem was attempting to undermine him." Id. ¶¶ 21, 24, 27.  During his deposition, Mr. Heneghan testified that he had "said to Dr. Bugaighis on a few occasions that [Ms. Beetem] seems to be having trouble with" or "had problems with" various male guest directors working in NCC's theatre program.  Heneghan Dep. 1, 200:8-14.  He explained that Ms. Beetem had threatened him by confronting him with an accusation that he should not be directing a play that used funds allocated by the College Life Committee, a committee that he chaired.  See Heneghan Dep. 2 at 13:21-17:15.  He told Dr. Bugaighis that Ms. Beetem had accused him of "using money illegally or [fraudulently]," and explained the circumstances of the situation to her.  See id. at 17-19:10  Dr. Bugaighis said she would look into it and never brought up the topic again.  See id.  While Mr. Heneghan suspected that Ms. Beetem had voiced her allegations to others, he had no facts supporting that conclusion.  See id. at 19:11-20:12.  He also told Dr. Bugaighis that Ms. Beetem had told him "that [his] window for obtaining a job at a four year college or university was rapidly closing" and told him that if he was going to leave NCC, he should do so soon.  Id. at 21:12-19.  Dr. Bugaighis did nothing about this.  Id. at 22:4-9.  Mr. Heneghan again referred to the letter he sent to Dr. Bugaighis on March 5, 2008, voicing his concern that Ms. Beetem had accused him of not properly doing his job.  See id. at 22:15-24:24.  He claimed that the letter described the divisiveness that Ms. Beetem created in the department.  See id. at 25:20-26:2  Mr. Heneghan has not produced this letter.

Mr. Heneghan admitted that he had no evidence that the concerns brought up by NCC administrators in connection with the rescission of his tenure appointment came from reports by Ms. Beetem.  Heneghan Dep. 2, 27:9-16.  He admitted that in his conversations with Dr. Bugaighis about Ms. Beetem, he never accused her of sexual harassment or sexual discrimination, and instead simply "[let] Dr. Bugaighis know that [Ms. Beetem] had a problem with me and other guys."  Id. at 28:23-29:7.  The "other guys" to whom he was referring were two men from the media services department that Ms. Beetem accused of, and reported for, taking drugs during an on-campus event.  See id. at 29:6-30.  He also described instances in which Ms. Beetem had been unhelpful, hostile, or rude to male students in the Theatre Department and to a male music director working there.  See Heneghan Dep. 2, 71:22-75:15.  Mr. Heneghan stated that had told Dr. Bugaighis that Ms. Beetem didn't want him in the program, told him that his window of opportunity for work at a four year college was closing, and undermined his work.  See id. at 33:1-18.  Mr. Heneghan did not remember ever voicing concerns about Ms. Beetem's anti-male animus, towards him or any other males, during his meeting with the Board on May 7, 2009.  See id. at 41:7-12.

### C.      Procedural Posture

Mr. Heneghan filed a complaint in this Court on October 29, 2009.  He filed an amended complaint on January 19, 2010, against Northampton Community College, Dr. Bugaighis, and Dr. Whitaker.  After he filed his amended complaint, defendants filed a motion to dismiss.  In a Memorandum and Order dated July 7, 2010, this Court ruled that dismissal of Mr. Heneghan's procedural due process claim was inappropriate.  This Court did *not* find that Mr. Heneghan had achieved tenured status as a result of the Board's March 5, 2009 vote.  Mem. Granting in Part

and Denying in Part Def.'s Mot. To Dismiss, 10 ("Viewing the facts alleged in the complaint in his favor, it would be inappropriate to find as a matter of law that Heneghan had no property interest in continued public employment with NCC. Heneghan *alleges* that the NCC Board's March 5, 2009 vote granted him tenure." (emphasis added)).

Following the Court's ruling on the motion to dismiss, Mr. Heneghan filed a second amended complaint containing the same factual averments. In Count I, he alleges that NCC is liable under 42 U.S.C. § 1983 for violating his "constitutionally protected right to tenured public employment." Second Am. Compl. ¶ 46. In Count II, he alleges that NCC is liable under Title VII of the Civil Rights Act ("Title VII") for "treating [him] in a disparate manner based upon his sex." Id. at ¶ 50. In Count III, he alleges that NCC and Dr. Bugaighis are liable under the Pennsylvania Human Relations Act ("PHRA") for "subjecting [him] to more onerous working conditions and treating [him] in a disparate manner." Id. at ¶ 53. Defendants have filed a motion for summary judgment in their favor on these claims.

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party. Id.

A party seeking summary judgment initially bears responsibility for informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing relevant portions of the record, including depositions, documents, affidavits, or declarations, or showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support the fact.  FED. R. CIV. P. 56(c).  Summary judgment is therefore appropriate when the non-moving party fails to rebut the moving party's argument that there is no genuine issue of fact by pointing to evidence that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322; Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir.1992).

## III.    DISCUSSION

### A.    Procedural Due Process Claim

Mr. Heneghan alleges that NCC violated his rights under section 1983 "by depriving him of his constitutionally protected right to tenured public employment as guaranteed by the Fourteenth Amendment . . . in that Plaintiff was terminated from his position."  Second Am. Compl. ¶ 46.  The Fourteenth Amendment prohibits deprivations "of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.[2]  If a plaintiff asserts individual life,

---

[2] Section 1983 imposes civil liability upon a person who, acting under color of state law, deprives another person of any rights, privileges or immunities secured by the Constitution or laws of the United States. 42 U.S.C. § 1983; Gruenke v. Seip, 225 F.3d 290, 298 (3d Cir. 2000).  "To state a claim under § 1983, a plaintiff must show that the defendant, through conduct sanctioned under the color of state law, deprived

liberty, or property interests, states are required to ensure that certain procedural safeguards are in place before the plaintiff is deprived of those interests.  Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000).  To have a property right in public employment protected by procedural due process, "a person must have more than a unilateral expectation of continued employment[.]" Elmore v. Cleary, 399 F.3d 279, 282 (3d Cir. 2005).  He must instead have "a legitimate entitlement to such continued employment."  Id. (citing Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972)).

A legitimate property interest in continued employment with the government arises from the operation of state law, which can confer such an interest either through statute or through a contract.  Bishop v. Wood, 426 U.S. 341, 345-36 & n.8 (1976); Perry v. Sinderman, 408 U.S. 593, 601 (1972); Unger v. Nat'l Residents Matching Program, 928 F.2d 1392, 1398 (3d Cir. 1991).  Because public employees in Pennsylvania are presumed to be at-will employees, a property interest under an employment contract with the government arises only if termination under that contract must be "for cause."  Unger, 928 F.2d at 1399; see also Gilbert v. Homar, 520 U.S. 924, 928-29 (1997) ("[P]ublic employees who can be discharged only for cause have a constitutionally protected property interest in their tenure and cannot be fired without due process[.]").  A legitimate claim of entitlement to continued employment can also arise from a government employer's policies and practices.  See Perry, 408 U.S. at 602.

If a public employee has a legitimate interest in continued employment, he is entitled to "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story" before his or her employment is terminated. Cleveland Bd. Of Ed. v. Loudermill, 470 U.S. 532, 546 (1985).  Notice and an opportunity to be

---

her of a federal constitutional or statutory right."  Gruenke, 225 F.3d at 298 (citing Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 907 (3d Cir.1997)).  The defendants do not dispute that NCC is subject to liability under Section 1983 or that Section 1983 applies to violations of the Fourteenth Amendment.

heard are necessary because of the significance of the private interest in retaining employment, and because of the importance of such procedures in ensuring that employing officials reach an accurate decision, both in terms of the facts alleged and the appropriateness of the response.  See id. at 543-544.  A pre-termination hearing in the public employment context is to operate as an "initial check against mistaken decisions."  Id. at 545.  Such a hearing is "essentially a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action."  Id. at 546.  Therefore, a pre-termination hearing can be " 'something less' than a full evidentiary hearing" and "need not be elaborate.' " Id. at 545.  "The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement."  Id. at 546.

### 1.      Existence of a Property Interest

Although the College concedes for the purpose of argument that Mr. Heneghan had a protected property interest, it also argues that Mr. Heneghan was not deprived of a property interest[3] because his standard appointment for tenure did not take effect until the 2009-2010 school year, and the vote granting him tenure was rescinded in April of 2009, before the 2009-2010 school year began.  See Def.'s Mem. In Support of Mot. For Summary J. at 4, n.4.  Mr. Heneghan argues in response that he had a legitimate expectation of continued employment both because the Board's vote on March 5, 2009 was executory and would take effect the following fall without further action, and because no NCC professor had ever had a tenure decision reversed.  Ms. Whitaker testified that NCC had never before had a situation where a professor

---

[3]  The defendants state in their brief that "plaintiff was not deprived of a liberty interest" because his tenure appointment had not yet taken effect.  Because Mr. Heneghan nowhere asserts deprivation of a liberty interest and instead asserts that he was deprived of a property interest, I will not consider whether there is a liberty interest at stake.

was recommended for a standard appointment, the Board accepted the recommendation, and the decision was rescinded only a few days later.  Whitaker Dep. 30:22 – 31:11.

Relevant Supreme Court precedent "has made clear that a government employer's policies and practices can create a legitimate claim of entitlement to continued employment." Gunasekera v. Irwin, 748 F. Supp. 2d 816, 822 (S.D.Oh. 2010) (citing Perry, 408 U.S. at 602) (finding that tenured professor who was terminated from his position had a legitimate claim of entitlement to continued employment where, before he was stripped of his position, "no other professor had ever suffered such a sanction.").  Mr. Heneghan has demonstrated that, at the time his standard appointment was revoked, it was NCC's practice to honor granted tenure appointments the following academic year.  He has also demonstrated that the College had never before revoked a standard tenure appointment after granting it.  Mr. Heneghan has therefore presented sufficient facts on summary judgment to demonstrate that he had a legitimate claim of entitlement to continued employment following the Board's vote granting him a standard appointment.

## 2.      Adequacy of Process Afforded

NCC accepts for the sake of argument that Mr. Heneghan had a protected property interest, and maintains that "it is beyond dispute that he was provided with due process."  Def.'s Mem., 4.  Before considering whether the process received by Mr. Heneghan was in accord with the requirements of the due process clause, I briefly note Mr. Heneghan's argument that he was entitled to a "hearing before a neutral hearing officer."  Pl.'s Mem. at 7.  Mr. Heneghan is incorrect.  He relies on only one case, inapplicable in the context of public employment, for his

argument that he was entitled to a hearing before a neutral officer,[4] and fails to recognize that Loudermill provides the standard applicable in his case.

Assuming Mr. Heneghan had a legitimate expectation of continued employment based on the Board's vote, he was entitled, under Loudermill, to be made aware of the College's allegations of inappropriate behavior and to respond to those allegations in order to ensure that NCC officials could hear his side of the story.  He was *not* entitled to an elaborate, adversarial proceeding but rather could tell his story either in person or in writing.  Mr. Heneghan received the process to which he was entitled.  Shortly after receiving the letter informing him that the Board's tenure decision had been revoked, but *before* it reached a final decision on the issue, Mr. Heneghan was invited to attend a meeting with four college administrators where he was told of NCC's concerns about his treatment of students, specifically kissing a student and bringing beer to a student party, and his non-collegial behavior with other professors in his department.  He was given a chance to respond orally to these concerns.  He also submitted a letter to the same NCC officials further explaining his view of the incidents.  It was not until after the meeting with

---

[4] This case, Schweiker v. McClure, 456 U.S. 188 (1982), addressed the procedural due process that must be afforded to individuals making claims under Part B of the Medicare program.  See id. at 189-90.  The government authorized the Secretary of Health and Human Services to contract with private insurance carriers to administer claims under Medicare Part B, and the Court ruled that due process demands impartiality on the part of those hearing officers who reviewed claim denials, because they were acting in "judicial or quasi-judicial capacities."  See id. at 195.  In concluding that Medicare beneficiaries were entitled to a hearing before a neutral officer, the Court considered the now-familiar factors articulated in Mathews v. Eldridge, 424 U.S. 319, 335 (1976): "the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  The Court accepted the District Court's conclusion that the private interest in Part B reimbursement was "considerable" though "not quite as precious as the right to receive welfare or social security benefits."  Schweiker, 456 U.S. at 198.  The Supreme Court applied the Mathews factors in the context of public employment in Loudermill, and set forth the standard described in the body of this memorandum.  See *infra* Section III(A).  Mr. Heneghan fails to recognize that because the property interest at stake in Sckweiker – benefits under a government-run medical insurance program – is distinct from the property interest at stake in public employment cases, the procedures required under the Fourteenth Amendment differ considerably in each case.  Schweiker is simply inapplicable here.

the NCC officials and his submission of a written response that the Board ratified the rescission of his appointment.  Following that decision, he was given a written explanation of the reasons for the rescission and was given yet another opportunity to explain his side of the story when he was granted an appeal before the NCC Board.

At that appeal, he had the representation of a Federation lawyer, he was able to submit documents in support of his arguments, he gave an opening statement, and he answered questions about the allegations against him.  NCC viewed Mr. Heneghan's situation as a denial of standard appointment and not as a revocation of already-granted tenure.  Therefore, when Mr. Heneghan filed a grievance, the remedy available to tenured faculty in the event of termination or discipline, it was denied.  However, Mr. Heneghan did not proceed to the following two steps of the grievance process, which were presumably available to him.  He admits that the Union, which represented him, elected not to do so.

Mr. Heneghan was afforded numerous opportunities to explain his side of the story before his tenure was revoked – he did so both orally and in writing before an ultimate decision was made on rescission, he was afforded a hearing following rescission, and there was a three-step, post-termination grievance process available to him, which he did not pursue past the first step.  The undisputed facts show that he was afforded the process due to him prior to the Board's rescission of his tenure appointment, and that adequate post-deprivation remedies were available pursuant to the CBA.  Therefore, summary judgment in NCC's favor on his procedural due process claim will be granted.

B.      **Employment Discrimination Claim**

Mr. Heneghan alleges that the College discriminated against him on the basis of gender in violation of Title VII and the PHRA.[5]  He claims that Ms. Bugaighis is liable under the PHRA for aiding and abetting NCC's illegal discrimination.[6]  Under Title VII and the PHRA, it is unlawful to discriminate against an individual with respect to the compensation, terms, conditions or privileges of employment because of that individual's gender.  42 U.S.C. § 2000e-2(a)(1).  "[G]ender-based employment discrimination claims can be brought under theories of hostile work environment, disparate treatment, or disparate impact."  Tomaselli v. Upper Pottsgrove Twp., No. 04-2646, 2004 WL 2988515 at *3 (E.D.Pa. Dec. 22, 2004).  In his complaint, Mr. Heneghan alleges that he was subject to disparate treatment, in that he was treated less favorably than females in the Theatre Department, reported threats made to him by Ms. Beetem to the NCC administration and never received a response, and then had his tenure decision revoked on the basis of Ms. Beetem's unsubstantiated allegations.  See Second Am. Compl. ¶¶ 22-24, 40-41, 50, 53.  A plaintiff can prove discrimination through either direct, see Torre v. Casio, Inc., 42 F.3d 825, 829 (3d Cir. 1994), or indirect evidence, see McDonnell Douglas Corp v. Green, 411 U.S. 792, 802 (1973).

Direct evidence is evidence which, if believed, would prove the existence of a fact in issue without any inference or presumption.  Torre, 42 F.3d at 829.  It is evidence that demonstrates that "decision makers placed substantial negative reliance on an illegitimate

---

[5] The PHRA is construed in accordance with its federal counterparts, including Title VII.  See Kelly v. Drexel Univ., 94 F.3d 102, 104 (3d Cir. 1996).

[6] Under the PHRA, it is unlawful for any employee "to aid [or] abet the doing of any act declared [under the PHRA] to be an unlawful discriminatory practice[.]"  43 P.S. § 955(e).  Dr. Bugaighis only faces aiding and abetting liability if there is evidence that the College's employment decision was motivated by gender discrimination.  See Milby v. Greater Philadelphia Health Action, No. 06-4556, 2008 WL 2278143, *5 (E.D.Pa. June 3, 2008) (concluding that because the court found that plaintiff had failed to adduce competent evidence of discrimination against her by the employer, her claims against the individual defendants were without merit).

criterion in reaching their decision." Anderson v. Colsol. Rail Corp., 297 F.3d 242, 248 (3d Cir.

2002). "Only the most blatant remarks, whose intent could be nothing other than to discriminate

in reaching an employment decision, are considered sufficient to constitute direct evidence of

discrimination." Weightman v. Bank of New York Mellon Corp., -- F.Supp.2d --, 2011 WL

673915 at *6 (W.D.Pa. Feb 17, 2011) (citing Taylor v. Procter & Gamble Dover Wipes, 184 F.

Supp. 2d 402, 413 (D.Del.2002)). In mixed motives cases, the plaintiff can survive summary

judgment by showing with direct evidence that a protected characteristic was a motivating factor

for an employment action. See 42 U.S.C. § 2000e-2(m); Cobetto v. Wyeth Pharmaceuticals, 619

F. Supp. 2d 142, 155-56 (W.D.Pa. 2007) (citing, inter alia, Desert Palace, Inc. v. Costa, 539 U.S.

90, 101 (2003)). Under the mixed motives theory, "both legitimate and illegitimate reasons

motivated the [employment] decision." Desert Palace, 539 U.S. at 93. The record in this case

contains no evidence that Mr. Heneghan's gender was a motivating factor in his termination. He

cites numerous incidents in which he was treated poorly by Ms. Beetem, but he points to no

actual discriminatory remarks or blatant gender-based characterizations, instead describing

situations in which the conflicts between he and Ms. Beetem were clearly based on legitimate

workplace issues and concerns.[7] Mr. Heneghan also admitted that, in his discussions about Ms.

Beetem with Dr. Bugaighis, he never complained that she was sexually discriminating against

him or sexually harassing him.[8]

Indirect, or circumstantial, evidence of discrimination is evidence that creates an

inference of discrimination. When an employee relies on circumstantial evidence of

---

[7] See, e.g. Heneghan Dep 2 at 14-17 (describing Beetem's concern that Mr. Heneghan's position on the college life committee created a conflict of interest where that committee allocated money for a play Heneghan directed); id. at 20:5-12 (admitting that he had no facts to support his suspicion that Beetem had shared her concerns with other colleagues in the department); 29:6-30:20 (describing Beetem's concern about two men in media services because she suspected them of using drugs, not simply because they were male).
[8] See Heneghan Dep. 2 at 30:17-22.

discrimination, he must first establish a *prima facie* case before any burden shifts to the

employer. McDonnell Douglas, 411 U.S. at 802.  To state a *prima facie* case, a plaintiff must

show that: (1) he is a member of a protected class; (2) he was qualified for the position he sought

to attain or retain; (3) he suffered an adverse employment action; and (4) the action occurred

under circumstances that could give rise to an inference of intentional discrimination.  See

Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008).  Once the plaintiff establishes a *prima*

*facie* case of discrimination, the burden of persuasion shifts to the employer to articulate a

legitimate, non-discriminatory reason for the challenged decision.  Id.  If the defendant succeeds,

the burden returns to the plaintiff to show that the employer's stated reason for termination was

merely a pretext for intentional discrimination.  Id.

Defendants argue that to establish a *prima facie* case under a disparate treatment theory

of liability, a complainant must show that he was (1) a member of a protected class (2) who was

qualified for the job from which he was discharged and (3) others not in the protected class were

treated more favorably.  Def.'s Mem. at 7 (citing Goosby v. Johnson & Johnson Medical, Inc.,

228 F.3d 313, 318-319 (3d Cir. 2000)).  NCC does not dispute that Mr. Heneghan has met the

first two elements of this *prima facie* case, and instead argues that it is entitled to summary

judgment because Mr. Heneghan "has produced no evidence of any other similarly situated

employee, let alone a female employee, who he contends was treated differently from him"

because he has failed to identify "any other similarly situated individual who engaged in similar

behavior who had his tenure appointment rescinded."  Def.'s Mem., 8.  Defendants' reliance on

this standard is unsound.  "The prima facie case in a gender discrimination action is 'highly

factually dependent[,] and plaintiffs need not point to different treatment for similarly situated

employees in every case,' though facts suggesting such different treatment are 'highly probative'

of discrimination."  Hobson v. St. Luke's Hosp. & Health Network, 735 F. Supp. 2d 206, 214

(E.D.Pa. 2010) (citing Abbasi v. SmithKline Beecham Corp., No. 08-277, 2010 WL 1246316, at

*5 (E.D.Pa. Mar. 25, 2010)).  Mr. Heneghan has produced evidence that *no* other NCC

employee, male or female, has ever had a tenure appointment revoked, so to dismiss his case

under this proposed standard is inappropriate, since there is no way for him to compare his

unique situation to that of another NCC professor.

Defendants do not address the first three elements of the properly stated, four-part *prima*

*facie* case.  Mr. Heneghan meets these elements – he is a member of a protected class under Title

VII,[9] it appears he was qualified for the position, and rescission of his tenure appointment was an

adverse employment action.  Therefore, the question becomes whether NCC has offered a

legitimate, non-discriminatory reason for revoking his offer of tenure.  Because NCC cites and

adheres to an improperly phrased standard for its *prima facie* case, it has not addressed whether

Mr. Heneghan has offered evidence showing that his tenure was revoked under circumstances

that could give rise to an inference of intentional discrimination.  Neither has it argued that,

assuming Mr. Heneghan has met his *prima facie* burden, NCC had a legitimate

nondiscriminatory reason for rescinding his tenure.

Mr. Heneghan fails to point out this deficiency in his response to the defendants' motion,

arguing instead that his gender discrimination claims should survive summary judgment because

he "has testified that he brought numerous incidents of mistreatment of males by Beetem to the

attention of Dr. Bugaighis . . . and there is no evidence that any action at all was taken."  Pl.'s

Resp., 8.

---

[9] The protected class element has been extended to reach cases of "reverse discrimination," where a
member of a majority group alleges that he or she was discriminated against in favor of a member of a
minority group. Iadimarco v. Runyon, 190 F.3d 151, 158 (3d Cir.1999).  Mr. Heneghan's claim of gender
discrimination falls into this category.

Mr. Heneghan has failed to allege conduct giving rise to an inference of discrimination. The evidence in the record, and his own descriptions of his relationship with Ms. Beetem, indicate he and she had nothing more than a personality conflict.  However, even assuming that he has stated a *prima facie* case, there is ample evidence in the record to conclude that NCC had legitimate, nondiscriminatory reasons for rescinding Mr. Heneghan's tenure appointment.  He admitted bringing beer to a student party, kissing a student during a play rehearsal, and making a comment about a student's physical appearance in class.  In addition, he exhibited improper behavior towards his colleagues.  NCC has provided evidence that its concerns about his non-collegial behavior were legitimate and arose prior to the rescission of his tenure appointment.  As written by Dr. Bugaighis to Mr. Heneghan in August of 2008:

> You elected again this year to use the occasion of the annual self-assessment to lambaste colleagues and list your grievances.  Last year I gave it a pass.  Despite the difficulties in the department last year, your colleagues did not reciprocate in kind.  Despite your stormy relationship with Norman Roberts, he gave you a very positive peer evaluation for the year.  I am increasingly concerned about your ability to work effectively within the department, and the college, regardless of the recent personnel change.  I believe this is a serious impediment to your success at Northampton.

Def. Ex. 14.  Mr. Heneghan's self-evaluation that year indeed contained disparaging comments about Mr. Roberts.  See id.  Mr. Heneghan's inappropriate behavior with students and his demonstrated unwillingness to treat colleagues in his department with respect were legitimate nondiscriminatory reasons for rescinding his tenure, as expressed in the April 15, 2009 letter he received from Ms. Whitaker describing why the Board of Trustees adopted the recommendation that his tenure be revoked.  See Def. Ex. 6.

Mr. Heneghan has failed to provide any evidence that NCC's stated reasons for rescinding his tenure were pretext for discrimination on the basis of his gender.  His only

argument, that he had brought numerous incidents of mistreatment of males to the attention of

Dr. Bugaighis, is belied both by his deposition testimony and his own characterization of his

complaints to her.  In his letter to NCC administrators providing his side of the story with respect

to their accusations against him, he stated:

> [I]nconsistencies with my colleagues have been a challenge.  I broached the
> subject last year with Elizabeth [Bugaighis] after Jaye Beetem and I
> conflicted over production difficulties and personality issues.  I ask you all
> to review my repeated attempts, in the spring of last year and throughout
> this year, to try to find mutual resolutions for conflict through the proper
> channels at NCC.

Def.'s Ex. 15.  In other words, even as it became clear that he was in danger of losing his job,

Mr. Heneghan did not express concerns about sexual discrimination at the hands of Dr.

Bugaighis or Ms. Beetem and rather stated that he and Ms. Beetem "conflicted over production

difficulties and personality issues."  He has failed to offer any evidence whatsoever that NCC's

stated reason for rescinding his tenure appointment was pretext for gender discrimination.

Mr. Heneghan has failed to present sufficient evidence to survive summary judgment on

his claim that NCC discriminated against him on the basis of his gender.  Because he has failed

to state a claim against NCC under Title VII and the PHRA, his PHRA aiding and abetting claim

against Dr. Bugaighis is also without merit.


**IV.    CONCLUSION**

For the reasons set forth above, defendants' motion for summary judgment will be

granted.